# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARLENE REUTZEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-944 |
| | ) | |
| v. | ) | Judge Marilyn J. Horan |
| | ) | |
| ANSWER PRO, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

On July 18, 2017, Plaintiff Marlene Reutzel filed a Complaint alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* (ECF No. 1). Defendant Answer Pro, LLC filed its Answer on October 18, 2017. (ECF No. 8). Following discovery, Answer Pro filed a Motion for Summary Judgment, seeking judgment in its favor on all claims, on December 14, 2018. (ECF No. 40). The parties provided Concise Statements of Material Facts and relevant appendices, (ECF Nos. 42–44, 50, 52, 56–57), and briefed the issues, (ECF Nos. 41, 48–49, 55). The Court heard oral argument on the Motion on May 29, 2019. (ECF No. 59). The Motion is now ripe for decision.

For the following reasons, the Motion will be granted in part and denied in part.

## I. Background

In 1994, Marlene Reutzel began working for Pittsburgh Telephone Answering Service (PTAS). ECF No. 42, at ¶ 5. During Ms. Reutzel's employment with PTAS, she worked as the sole employee in the sales and marketing department, cultivating new clientele through a variety

1

of sales techniques. *Id.* at ¶¶ 9–10. In addition to her responsibilities in sales and marketing, Ms. Reutzel, along with a handful of other PTAS employees, supervised and trained operators, attended weekly management meetings, answered calls at peak hours, and engaged in collections. *Id.* at ¶¶ 13–14, 16–19. Her compensation consisted of hourly wages and sales commissions. *Id.* at ¶ 10. After about two years at PTAS, Ms. Reutzel was given the title of Vice President of Sales and Marketing. *Id.* at ¶ 11. The change in title affected neither Ms. Reutzel's job duties nor her compensation. *Id.*

Ms. Reutzel was subsequently diagnosed with Multiple Sclerosis (MS) in 1997, and she shared this news with two coworkers, Cheryl Holden and Vicki Bassler, shortly thereafter. *Id.* at ¶¶ 97–98. Ms. Reutzel's healthcare providers did not place, and have not since placed, any restrictions related to her MS diagnosis on Ms. Reutzel's work activity. *Id.* at ¶ 104.

Nearly fifteen years after her diagnosis, in October 2012, Answer Pro acquired PTAS. *Id.* at ¶ 6. Answer Pro retained PTAS's employees, but it made changes to the business operations and structure. *Id.* at ¶¶ 7, 26. First, although Ms. Reutzel's job duties, including supervisory duties, remained mostly the same, Ms. Reutzel and others, who also held Vice President titles at PTAS, did not maintain their titles following Answer Pro's acquisition of the business. *Id.* at ¶¶ 20, 29. Second, around late November or early December 2012, Answer Pro's then-Executive Vice President, Thomas Halton, asked for weekly reports of certain sales data prior to the weekly management meetings. *Id.* at ¶¶ 40–41; ECF No. 44-1, at 15; ECF No. 44-4, at 11. To facilitate this, site manager Joseph Dickinson created an Excel spreadsheet for Ms. Reutzel to enter the weekly information. ECF No. 42, at ¶ 42. Third, Mr. Halton began running the weekly management meeting, and around January 2013, he decided to divide it into two meetings. *Id.* at ¶¶ 31, 33; ECF No. 44-3, at 7. One weekly meeting focused on sales

2

activity, which Ms. Reutzel was asked to attend. ECF No. 42, at ¶¶ 33, 35. The second meeting focused on business operations, which other supervisors, who were responsible for the day-to-day operations of the call center, were asked to attend. *Id.* at ¶¶ 33, 38.

In addition, around January or February 2013, Answer Pro implemented two new marketing initiatives targeting potential clients through the company's website and postcard mailers. *Id.* at ¶ 50; ECF No. 44-3, at 7. The owner of Answer Pro, George Otte, and Mr. Halton decided to keep these new marketing initiatives separate from the existing marketing activities. ECF No. 42, at ¶ 55. In order to track the results from those initiatives, inquiries from those initiatives were funneled to Mr. Halton, or to site manager Joseph Dickinson, or to employee Jonathan Dickinson. ECF No. 42, at ¶ 51. According to Answer Pro, if a caller indicated interest in engaging Answer Pro's services, that caller's information would then be forwarded to Ms. Reutzel to make the sale. *Id.* at ¶ 53.

As to Mr. Halton's request that Ms. Reutzel report certain sales data in an Excel spreadsheet, Ms. Reutzel, who was not familiar with spreadsheets, had difficulty entering the requested information. *Id.* at ¶ 43; ECF No. 44-1, at 15. Ms. Reutzel would accidentally delete columns of information, and other information that she entered "would kind of disappear" from the spreadsheet. ECF No. 44-1, at 15–16, 18. After Ms. Reutzel submitted her first spreadsheet report, in or around November or December 2012, site manager Joseph Dickinson discussed these problems with her. *Id.* at 16; ECF No. 44-4, at 11. In response, she explained that she did not know how to use Excel, and asked Answer Pro to pay for her to take a class. ECF No. 42, at ¶ 44; ECF No. 44-1, at 16. Rather than agree to pay for her to take a class, Joseph Dickinson showed Ms. Reutzel how to use the spreadsheet and asked her to continue to "work on it on [her] own for a while." ECF No. 44-1, at 16–17. Shortly thereafter, Ms. Reutzel again had difficulty

3

with the spreadsheet entries, resulting in a second conversation between Ms. Reutzel and Joseph Dickinson to address the issue. *Id.* at 16–18. Ms. Reutzel again asked if Answer Pro would pay for her to take a class on spreadsheets. *Id.* at 17. Joseph Dickinson directed Ms. Reutzel to provide the relevant data to employee Jonathan Dickinson, who would then enter the information into the spreadsheet. ECF No. 42, at ¶ 47. According to Joseph Dickinson, while Mr. Halton needed the sales information for the weekly management meeting, the process by which the information was provided was not a significant issue. ECF No. 44-4, at 11.

On March 6, 2013, Ms. Reutzel was called into a meeting with Joseph Dickinson, Ms. Bassler, and Mr. Otte's secretary. ECF No. 42, at ¶ 63. At this meeting, Joseph Dickinson presented Ms. Reutzel with a memorandum, prepared in consultation with Mr. Halton, that listed several items concerning her job performance. *Id.* at ¶¶ 64–65. First, the memorandum addressed customer accounts for which Ms. Reutzel entered incorrect information into Answer Pro's software system. ECF No. 44-2, at 1. The incorrect data entry caused billing errors, and it had a negative impact on Answer Pro's ability to professionally serve those customers. *Id.* Next, the memorandum stated that customer order forms were not being filled out completely or correctly, and that names on new account forms did not match the names entered in the software system. *Id.* The memorandum also addressed a concern that Ms. Reutzel was not reporting phone calls for a specific customer account. *Id.* Finally, it noted that she was not timely turning in the weekly sales information. *Id.* Consequently, the memorandum advised Ms. Reutzel that she was expected to turn in sales reporting "on time and accurately," and that she was expected to make and report the necessary calls on a specific customer account. *Id.* Ms. Reutzel was also informed that she was no longer allowed to enter customer information into the software system. *Id.* Ms. Reutzel's "supervisor access"—the software function that allowed data entry—was thus

removed. ECF No. 42, at ¶¶ 72, 78–79. Additionally, according to Ms. Reutzel, Joseph Dickinson informed her that the sales commissions for the accounts would be split between her and the data entry person. ECF No. 44-1, at 27. However, by the time Ms. Reutzel quit her job with Answer Pro three months later, commission-splitting had not occurred. *Id.* According to Answer Pro, the reallocation of data entry duties did not result in any change to Ms. Reutzel's compensation. ECF No. 42, at ¶ 77.

On March 20, 2013—two weeks after the March 6 meeting and memorandum—during a conversation with Joseph Dickinson after a weekly sales meeting, Ms. Reutzel informed him that she has Multiple Sclerosis (MS).[1] ECF No. 42, at ¶ 99; ECF No. 44-1, at 31. Ms. Reutzel told no other Answer Pro employees about her diagnosis. ECF No. 42, at ¶ 100.

In addition to her job performance-related issues and the changes to Answer Pro's business operations, Ms. Reutzel claims that throughout her employment with PTAS and later with Answer Pro, her fellow supervisors, Vicki Bassler and Cheryl Holden, harassed her. ECF No. 1, at ¶ 22; ECF No. 49, at 4. According to Ms. Reutzel, Ms. Bassler and Ms. Holden, in the presence of other employees, accused Ms. Reutzel of breaking office equipment. ECF No. 42, at ¶ 94. Ms. Holden testified, however, that Ms. Reutzel "breaking" things around the office was a friendly running joke in which Ms. Reutzel participated. ECF No. 44-6, at 5. Ms. Reutzel also claims that she was harassed on two other occasions. First, an employee complained that Ms. Reutzel had logged that employee out of the computer system and Ms. Holden confronted Ms. Reutzel about it. ECF No. 42, at ¶ 95. Second, in front of other employees, Ms. Bassler

---

[1] Joseph Dickinson denies that Ms.Reutzel informed him of her MS diagnosis, and testified that he only learned of her diagnosis when the EEOC charges were filed. ECF No. 44-8, at ¶ 47. However, Defendant Answer Pro stipulates, for the purposes of this Motion only, that Joseph Dickinson learned of Ms. Reutzel's diagnosis on March 20, 2013. ECF No. 42, at ¶ 99; ECF No. 44-4, at 12.

5

incorrectly accused Ms. Reutzel of not timely submitting a time slip and then required Ms. Reutzel to open the time slip box to see if it was there. *Id.* at ¶ 96.

In April 2013, according to Ms. Reutzel, the "final straw" occurred "when she learned that she would no longer be getting any leads to turn into sales." ECF No. 49, at 4; *see also* ECF No. 50, at ¶¶ 56–58, 61. Ms. Reutzel concluded that this would negatively impact her sales commission. ECF No. 49, at 4. Answer Pro disputes that Ms. Reutzel stopped receiving sales leads. ECF No. 55, at 5. Additionally, although Ms. Reutzel's testimony as to the timeline of events is not clear, she claims that, sometime between March 20, 2013 and April 2013, Joseph Dickinson told her that the reason why some of her responsibilities, including sales leads, were given to Jonathan Dickinson, was to try "to remove some of [Ms. Reutzel's] stress" because of her MS diagnosis. ECF No. 52-1, at 27. Answer Pro disputes that this conversation ever occurred. ECF No. 56, at ¶ 111.

Two months later, on June 21, 2013, Ms. Reutzel submitted her resignation, effective June 19, 2013, because she had secured employment elsewhere. ECF No. 42, at ¶¶ 106–07; ECF No. 44-2, at 4. She testified that had she not obtained other employment, she would have continued to work for Answer Pro. ECF No. 42, at ¶ 109. In October 2013, Ms. Reutzel filed charges of discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. ECF No. 42, at ¶ 110. It was only when Mr. Halton and Mr. Otte were informed of the EEOC charges that they learned for the first time of Ms. Reutzel's MS diagnosis. *Id.* at ¶¶ 101–02; ECF No. 44-3, at 23. Ms. Reutzel received her right-to-sue letter in May 2017. ECF No. 1, at ¶ 21.

Ms. Reutzel now brings claims alleging Answer Pro violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count I), and the Pennsylvania Human

Relations Act (PHRA), 43 P.S. § 951 *et seq.* (Count II), by "fail[ing] to consider a reasonable accommodation by engaging in the informal, interactive process, changing the terms and conditions of employment of the Plaintiff due to her disability, harassing the Plaintiff over her disability and essentially demoting the Plaintiff from her supervisory position which resulted in the Plaintiff having to terminate her employment." ECF No. 1, at ¶ 22. Answer Pro seeks summary judgment on all claims. ECF No. 40.

**II. Legal standard**

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it has "the potential to alter the outcome of the case." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011). A dispute regarding that material fact is genuine where the evidence must be "'such that a reasonable jury could return a verdict for the non[-] moving party.'" *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 93 (3d Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When assessing the evidence in the record, "the court must view the facts 'in the light most favorable to the non-moving party.'" *N.A.A.C.P.*, 665 F.3d at 475 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). If the moving party "shows that there is no genuine issue for trial, the non-moving party then bears the burden of identifying evidence that creates a genuine dispute." *Id.* Lastly, if "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to a judgment as a matter of law. *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S 317, 323 (1986)).

7

## III. Discussion

A. ADA claims

Ms. Reutzel alleges several grounds on which Answer Pro violated the ADA. First, she claims that Answer Pro changed the terms and conditions of her employment by prohibiting her from attending a weekly management meeting; by prohibiting her from entering data into the company's computer system; by removing her "supervisor access" to the computer system; by reallocating her duty to enter sales data into a spreadsheet; by splitting her sales commissions with others; and by preventing her from receiving new leads. ECF No. 1, at ¶ 11; ECF No. 49, at 2, 4. Second, she contends that several of these acts "essentially demoted" her from her supervisor position. ECF No. 1, at ¶¶ 11, 22. Third, she alleges that Answer Pro violated the ADA when it failed to provide a reasonable accommodation in response to her request for assistance with using Excel spreadsheets. *Id.* at ¶¶ 12, 22. Fourth, Ms. Reutzel claims that Ms. Bassler's and Ms. Holden's actions toward her—of accusing her of failing to turn in a time slip, of breaking office equipment, and of logging out a fellow employee from the computer system—constitute harassment for which Answer Pro is liable. *Id.* at ¶ 22; ECF No. 49, at 4. Lastly, Ms. Reutzel argues that she was constructively discharged because of the decisions and incidents, which she alleges caused stress, exacerbating her MS and requiring her to resign from her position with Answer Pro. *Id.* at ¶¶ 14, 22.

Answer Pro makes various arguments as to why it is entitled to summary judgment on Ms. Reutzel's claims. ECF No. 40. First, regarding the changes to the terms and conditions of employment, Answer Pro argues that these changes "were not adverse employment actions as a matter of law, have legitimate, non-discriminatory explanations, and in most cases, occurred without knowledge of Ms. Reutzel's alleged disability." ECF No. 40, at ¶ 3. Second, Answer

8

Pro contends that these changes, as to which there is no genuine issue of material fact, did not constitute a demotion for Ms. Reutzel. *Id.* Third, Answer Pro claims that it did, in fact, "provide[] a reasonable accommodation in response to Ms. Reutzel's" request for assistance with spreadsheet use, though it was not the accommodation Ms. Reutzel wanted; and in any event, "its alleged failure to engage in the interactive process alone is not actionable." *Id.*; ECF No. 41, at 12–13. Fourth, Answer Pro argues that "as a matter of law, Ms. Reutzel was not harassed on account of her disability." ECF No. 40, at ¶ 3. Lastly, Answer Pro contends that "the circumstances of Ms. Reutzel's employment with Answer Pro would not, as a matter of law, have compelled a reasonable person in her shoes to resign (i.e., she was not constructively discharged by Answer Pro)." *Id.*

> *i. Change in terms and conditions of employment, demotion, and failure to provide reasonable accommodation*

The ADA prohibits covered employers from discriminating against qualified individuals with disabilities "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order for a plaintiff to succeed on a claim that an employer discriminated against her in violation of the ADA, the plaintiff must establish, among other things, a causal connection between the employment decision at issue and the plaintiff's disability. *See CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235–36 (3d Cir. 2013). This causal connection, in the first instance, is based on the employer's knowledge of the plaintiff's disability: where the employer did not know, or have reason to know, of the plaintiff's disability, the employment decision cannot have been *because of*—that is, "on the basis of"—the plaintiff's disability. *See Williams v. AT&T Mobility Servs.*

*LLC*, 847 F.3d 384, 395 (6th Cir. 2017); *Taylor v. Principal Fin. Group*, 93 F.3d 155, 163 (5th Cir. 1996).

Here, Ms. Reutzel claims that a series of decisions, many of which allegedly amounted to a demotion from her supervisor status, were made on the basis of her disability. ECF No. 1, at ¶¶ 11, 22. However, all but one of these decisions were made before anyone responsible for making the decisions knew of her disability. To begin with, Mr. Halton's decision to bifurcate the weekly management meetings, and Mr. Halton's and Mr. Otte's decision to implement new marketing initiatives, occurred in January and February 2013, ECF No. 41, at ¶¶ 31, 33, 50, 55; ECF No. 44-3, at 7, but neither Mr. Otte nor Mr. Halton knew of Ms. Reutzel's disability until October 2013, ECF No. 42, at ¶¶ 101–02; ECF No. 44-3, at 23. Thus, there is no causal connection between these changes and her disability.

Next, Joseph Dickinson's decision to have someone else enter Ms. Reutzel's sales data into a spreadsheet appears to have occurred in November or December 2012. ECF No. 42, at 16; ECF No. 44-4, at 11. Additionally, his decisions to issue the memorandum noting Ms. Reutzel's poor job performance, to reallocate her data entry duties, to remove her supervisor access to the computer system, and to require her to share her commissions with others, occurred on or shortly after March 6, 2013. ECF No. 42, at ¶¶ 64–65, 72, 78–79; ECF 44-1, at 27; ECF No. 44-2, at 1. The evidence establishes that Joseph Dickinson did not know that Ms. Reutzel had a disability until March 20, 2013, at the earliest. ECF No. 42, at ¶ 99; ECF No. 44-1, at 31. Thus, there is no causal connection between these decisions and Ms. Reutzel's disability.

The decisionmakers for Answer Pro did not know of Ms. Reutzel's disability when they took these employment actions, and Ms. Reutzel does not point to any evidence that they had reason to know. Absent knowledge of the disability, there is no causal connection between

Answer Pro's employment actions and Ms. Reutzel's disability. Consequently, Ms. Reutzel's ADA claim fails as a matter of law as to these specific employment actions, and Answer Pro's Motion for Summary Judgment will be granted accordingly. As a result, the Court does not need to address the issues of demotion or reasonable accommodation.

The one employment action where there is a factual dispute concerns Ms. Reutzel's allegation that, beginning in April 2013, she was given no further sales leads. ECF No. 49, at 4; *see also* ECF No. 50, at ¶¶ 56–58, 61. Answer Pro disputes that she stopped receiving leads and argues that the calls from Answer Pro's new marketing initiatives were first handled by Joseph or Jonathan Dickinson, and any interested callers were then forwarded to Ms. Reutzel to close the sale. ECF No. 55, at 5. Ms. Reutzel also alleges that around this time, Joseph Dickinson told her that he was removing tasks from her because she had previously told him that stress at work was exacerbating her MS. ECF No. 52-1, at 27. Answer Pro denies these allegations. ECF No. 56, at ¶ 111. The discrepancy in the evidence establishes questions of fact that a jury must decide. As such, summary judgment is not appropriate for this claim, and Answer Pro's Motion for Summary Judgment concerning this claim will be denied.

*ii. Harassment*

Next, as regards harassment claims under the ADA, a plaintiff must first show that she "is a qualified individual with a disability under the ADA," that "she was subject to unwelcome harassment," and that "the harassment was based on her disability or a request for an accommodation." *Hatch v. Franklin Cty.*, 755 Fed. App'x. 194, 201 (3d Cir. 2018) (internal quotations omitted). The plaintiff then must establish that "the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment." *Id.* at 201–02. In order for harassment to be "sufficiently severe or pervasive,"

the plaintiff must show that the harassment was "both objectively and subjectively hostile or abusive." *Id.* at 202. To make this determination, "courts consider the totality of the circumstances" and "look to whether a workplace was 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of [the harassed employees].'" *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). After all, "[t]he ADA anti-discrimination mandate does not require a happy or even a civil workplace." *Ballard-Carter v. Vanguard Grp.*, 703 Fed. App'x. 149, 152 (3d Cir. 2017). Lastly, to establish an ADA harassment claim, a plaintiff must show "that [her employer] knew or should have known of the harassment and failed to take prompt effective remedial action." *Hatch*, 755 Fed. App'x. at 201.

Here, Ms. Reutzel claims that she was harassed when her coworkers, Ms. Bassler and Ms. Holden, accused her of failing to turn in a time slip, of breaking office equipment, and of logging out a fellow employee from the computer system. ECF No. 42, at ¶¶ 94–96. Answer Pro challenges Ms. Reutzel's harassment claim, arguing that "there are no facts in the record that establish harassment based on disability" and that the nature of the conduct at issue "is simply not objectively severe or pervasive enough to create a hostile or abusive working environment." ECF No. 41, at 25. The Court agrees. Although there is evidence that Ms. Bassler and Ms. Holden were made aware of Ms. Reutzel's disability as early as 1997, ECF No. 42, at ¶ 98, there is nothing in the record to support their actions were because of, or in relation to, Ms. Reutzel's disability. Additionally, considering the totality of the circumstances, while the incidents may have upset Ms. Reutzel, these events, even if they occurred as she alleges, were neither severe nor pervasive, and would not have "so heavily polluted [the workplace] with discrimination as to destroy completely the emotional and psychological stability of" Ms. Reutzel. Thus, Ms.

Reutzel's harassment claim under the ADA fails as a matter of law. Answer Pro's Motion for Summary Judgment upon such claim will be granted.

   *iii. Constructive discharge*

In regards to Ms. Reutzel's claim for constructive discharge under the ADA, she must show that the conditions of her employment were objectively intolerable, such that "'a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (quoting *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)). The intolerable conditions permitted by the employer, of course, must be based on the plaintiff's disability. *See* 42 U.S.C. § 12112(a). In this case, as discussed above, the majority of the complained-of employment actions occurred when Answer Pro had no knowledge of Ms. Reutzel's disability. Even to the extent that these employment actions could be considered intolerable, they nonetheless have no causal connection to Ms. Reutzel's disability. The alleged harassment likewise was unrelated to her disability, and in any event, was de minimis. Moreover, Ms. Reutzel's constructive discharge claim is undercut by the fact that she continued to work for Answer Pro for at least two to three months before she resigned to take a new job, and the fact that she would have continued to work for Answer Pro if she not found other employment. ECF No. 42, at ¶ 109.

Considering the totality of the evidence, the record does not establish a question that the employment conditions at issue were based on Ms. Reutzel's disability, or that a reasonable jury could find that such conditions were so intolerable as to make a reasonable person feel compelled to resign. Therefore, Ms. Reutzel's constructive discharge claim under the ADA fails as a matter of law. Answer Pro's Motion for Summary judgment will be granted.

B. PHRA claim

In Count II of her Complaint, Ms. Reutzel alleges that Answer Pro violated the PHRA by depriving her of employment opportunities and by adversely affecting her employment status as a result of her disability. ECF No. 1, at ¶ 30. She bases her PHRA claim on the same grounds as her ADA claim. *Id.* at ¶¶ 25–30. The Third Circuit generally interprets the PHRA in accord with the ADA, because the two Acts have parallel standards. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). Therefore, the foregoing analysis of Ms. Reutzel's ADA claim applies to her PHRA claim. As such, summary judgment in favor of Answer Pro as to Count II will be granted for all claims except Ms. Reutzel's claim that Answer Pro violated the PHRA by not giving her sales leads as of April 2013. For that claim, the Motion for Summary Judgment will be denied.

**IV. Conclusion**

Based on the foregoing, Answer Pro's Motion for Summary Judgment is DENIED in part and GRANTED in part. The Motion is denied as to Ms. Reutzel's claim in Counts I and II that Answer Pro violated the ADA and the PHRA when it no longer gave Ms. Reutzel inquiry leads because of her disability. Further, the Motion, challenging all remaining claims in Counts I and II is granted, and the Court accordingly will file a separate order pursuant to Rule 58, entering judgment in favor of Answer Pro, LLC.

DATE August 5, 2019

Marilyn J. Horan
United States District Judge